Ely Grinvald, Esq. (SBN 285475)
2355 Westwood Blvd., #562
Los Angeles, CA 90064
Phone: (310) 405-5684
grinvaldely@gmail.com

*Attorney for Plaintiff,*
*Darryl Taylor*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DARRYL TAYLOR,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MIDLAND CREDIT MANAGEMENT, INC., AND CITIBANK, N.A.,**<br><br>**Defendants.** | Case No:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Darryl Taylor, by and through the undersigned counsel, complains, states, and alleges against defendant Midland Credit Management, Inc. and Citibank, N.A., as follows:

## INTRODUCTION

1. This is an action to recover damages for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. (the "FDCPA") and Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, *et seq*. (the "RFDCPA").

2. In 1977, Congress enacted the Fair Debt Collection Practices Act ("FDCPA"), codified at 15 USC §§ 1692 *et seq.*, in response to the "abundant

evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). At that time, Congress was concerned that "abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." *Id.* Congress concluded that "existing laws . . . [we]re inadequate to protect consumers," and that "the effective collection of debts" does not require "misrepresentation or other abusive debt collection practices." 15 U.S.C. §§ 1692(b) and (c).

3. Congress explained that the purpose of the Act was not only to eliminate abusive debt collection practices, but also to "ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged." *Id.*, § 1692(e). After determining that the existing consumer protection laws were inadequate, Congress gave consumers a private cause of action against debt collectors who failed to comply with the Act. *Id.*, § 1692k.

4. In determining whether a collection letter violates the FDCPA, courts in the Ninth Circuit apply the least sophisticated consumer standard, "[i]f the least sophisticated debtor would likely be misled by a communication from a debt collector, the debt collector has violated the [FDCPA]." *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007).

5. The FDCPA does not ordinarily require proof of an intentional violation, and is considered a strict liability statute, whereby a single violation is sufficient to establish civil liability against a debt collector.

6. The RFDCPA is a "state version" of the FDCPA that "mimics or incorporates by reference the FDCPA's requirements," including sections 1692d through 1692f, "and makes available the FDCPA's remedies for violations." *Riggs v. Prober & Raphael*, 681 F.3d 1097, 1100 (9th Cir. 2012).

7. The RFDCPA is a strict liability statute. *Garcia v. Creditors Specialty Serv.,* No. 14-cv-01806-BLF, 2016 U.S. Dist. LEXIS 159686, at *15 (N.D. Cal. Nov. 2016).

## <u>JURISDICTION AND VENUE</u>

8. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 15 U.S.C. § 1692k(d).

9. The Court has supplemental jurisdiction of any state law claims pursuant to 28 U.S.C. § 1367 because the state law claims so related to federal claims in this Complaint that they form part of the same case or controversy.

10. This court has jurisdiction over defendant Midland Credit Management, Inc. and Citibank, N.A. because defendants regularly conduct and transact business in the State of California, and the conduct complained of herein occurred in this Judicial District.

11. Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) because a substantial part of the conduct complained of herein occurred in this Judicial District and defendant Midland Credit Management, Inc. is located in this Judicial District.

## PARTIES

12. Plaintiff Darryl Taylor ("Plaintiff") is a natural person who is a citizen of the State of California residing in Fontana, San Bernardino County, California.

13. Plaintiff is a "consumer" as that term defined by 15 U.S.C. § 1692a(3).

14. Defendant Midland Credit Management, Inc. ("MCM") is a company existing under the laws of the State of California, with its principal place of business in San Diego, California.

15. MCM has transacted business within this state as is more fully set forth hereinafter in this Complaint.

16. MCM regularly collects or attempts to collect debts asserted to be owed to others.

17. MCM is regularly engaged, for profit, in the collection of debts allegedly owed by consumers.

18. The principal purpose of MCM's business is the collection of such debts.

19. MCM uses instrumentalities of interstate commerce, including

telephones and the mails, in furtherance of its debt collection business.

20. MCM is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

21. Defendant Citibank, N.A. ("Citibank") is a wholly owned subsidiary of Citigroup, Inc. a consumer financial services company headquartered in New York, New York, doing business in the State of California, and within this District.

22. Citibank is a "debt collector" as that term is defined by Cal. Civ. Code § 1788.2(c).

23. Citibank is a "person" as that term is defined by Cal. Civ. Code § 1788.2(g).

## FACTUAL ALLEGATIONS RELATED TO ALL CLAIMS

24. MCM is a wholly-owned subsidiary of Encore Capital Group, which is one of the largest debt purchasers in the world. In 2024, MCM purchased record volumes of defaulted consumer debt, totaling $1 billion and collected $1.6 billion from consumers. At the end of 2024, MCM's estimated remaining collections exceeded $5 billion.

25. According to data provided by the Consumer Financial Protection Bureau (the "CFPB"), consumer complaints about debt buyers and collectors attempting to collect money not actually owed by the consumer are by far the most common of all complaints received by the Bureau every year, aside from credit

reporting. MCM is near the top for the entire country in terms of the volume of such complaints against debt buyers.

26. For instance, in 2015, the CFPB entered into a Consent Order with MCM, and related entities, for violations of the law, including the FDCPA, which required MCM, and related entities, to pay more than $42,000,000 in restitution and $10,000,000 civil penalty for i) failing to investigate disputes made by consumers, ii) forcing consumers to restart the dispute process each time a debt was transferred to a different debt collector, iii) falsely representing to consumers information regarding a debt when it was known or had reason to believe the information to be inaccurate, iv) engaging in scattershot litigation, v) preventing debt collectors from obtaining account-level documentation regarding consumer debts, vi) submitting affidavits to courts around the country with false or misleading testimony, vii) submitting affidavits to court around the country with false or misleading statements by sellers of the debt, viii) threatening and filing lawsuits to collect time-barred debts, ix) training collectors to create urgency when collecting time-barred debt over the telephone, and x) sending settlement offers to collect time-barred debts without informing the consumer that the debt was time-barred.

27. In 2018, 42 States Attorneys General entered into a settlement with MCM, and related entities, for $6,000,000 related to deceptive debt collection and litigation practices, such as filing affidavits in courts across the country when the

affiant lacked personal knowledge related to the statements in the affidavit and did not review the relevant files, also known as robo-signing.

28. Then, in 2020, the CFPB filed an action in this District against MCM, and related entities, asserting MCM, and related entities, failed to comply with the 2015 Consent Order by continuing to engaging in the prohibited conduct in the 2015 Consent Order. *See Bureau of Consumer Financial Protection v. Encore Capital Group, Inc., et al.*, No. 20-cv-1750-GPC-KSC (S.D. Cal. Oct. 16, 2020) (entering stipulation of final judgment.)

29. Despite the foregoing, creditors, including Citibank, regularly transfer portfolios of debts purportedly owed by consumers to MCM for purposes of collection.

30. MCM alleges Plaintiff owes MCM a debt for a personal credit card account, which Plaintiff maintained with Citibank.

31. Plaintiff retained attorneys to represent him with respect to the Citibank debt.

32. On December 27, 2019, and January 29, 2020, Plaintiff's attorneys notified Citibank of its representation of Plaintiff concerning the alleged debt and demanded that all further direct communications with Plaintiff concerning the alleged debt cease (the "Letters of Representation").

33. The Letters of Representation set forth Plaintiff's attorneys' name and

address.

34. The Letters of Representation set forth Plaintiff's dispute of the alleged debt.

35. In fact, Citibank acknowledged the Letters of Representation.

36. Creditors, like Citibank, have a pattern and practice of transferring or assigning debts after receipt of Letters of Representation because Citibank renders the account uncollectible once a consumer retains an attorney or provides a cease and desist.

37. Thereafter, on an exact date known only to MCM, the alleged debt was purportedly transferred, and/or assigned to MCM for the purposes of collection.

38. It is standard practice within the accounts receivable management industry, when debts are sold and/or assigned to downstream entities, including debt collectors, for such debts to be identified as subject to attorney representation letters and/or cease and desist letters.

39. It is standard practice within the accounts receivable management industry, when debts are sold and/or assigned in bulk portfolios to downstream entities, including debt collectors, for such portfolios to be identified, either explicitly, or through an indicator in the portfolio's file name, that such accounts are subject to attorney representation letters and/or cease and desist letters, such as such as "Cease and Desist Bulk," "C&D-POA," "CD-POA," "CAD," or "DSC."

40. MCM was notified by Citibank of Plaintiff's attorneys' representation in the transfer file(s) or the transfer file name included a notation which informed MCM that the portfolio was a portfolio of accounts of consumer who were represented by counsel.

41. MCM was notified by Citibank of Plaintiff's attorneys' representation in the Citibank account level documentation for Plaintiff.

42. MCM was notified by Citibank of Plaintiff's attorneys' information in the Citibank account level documentation for Plaintiff.

43. MCM was notified by Citibank of the cease and desist in the sale file(s) or the sale file name included a notation which informed MCM that the portfolio was a portfolio of accounts that previously provided a cease and desist from further direct communication with the consumer.

44. MCM was notified by Citibank of Plaintiff's cease and desist in the Citibank account level documentation for Plaintiff.

45. MCM was notified by Citibank of Plaintiff's dispute of the alleged debt in the account level documentation for Plaintiff.

46. On October 21, 2020, Plaintiff's attorneys again notified MCM of its representation of Plaintiff concerning the alleged debt and demanded that all further direct communications with Plaintiff concerning the alleged debt cease (the "Additional Letter of Representation").

47. Despite the Letters of Representation and Additional Letter of Representation, in an effort to collect the alleged debt, MCM caused a letter dated March 25, 2026 (the "March Letter") to be sent to Plaintiff directly.

48. Plaintiff received and read the March Letter.

49. Plaintiff did not consent to MCM's direct communication with Plaintiff.

50. Plaintiff's attorneys did not consent to MCM's direct communication with Plaintiff.

51. MCM did not send the March Letter to Plaintiff's attorneys.

52. MCM did not attempt to communicate with Plaintiff's attorneys concerning the alleged debt, prior to attempting to collect the alleged debt directly from Plaintiff in the March Letter.

53. In fact, MCM has a pattern and practice of communicating with consumers after receiving attorney representation letters and/or cease and desist letters.[1]

[1] By way of example only: *Carol Medof v. Midland Credit Management, Inc.*, 3:24-cv-00382-JLS-AHG (S.D. Cal.); *Kimberly Kennedy v. Midland Credit Management, Inc.*, 24-cv-01748-LL-MMP (S.D. Cal.); *Martha Mihich v. Midland Credit Management, Inc.*, 2:24-cv-06498-FMO-KS (C.D. Cal.); *Tonya Zimmern v. Midland Credit Management, Inc.*, 3:24-cv-00042-MCR-HTC (N.D. Fla.); *Maria Urcola v. Midland Credit Management, Inc.*, 2:24-cv-01049-JSM-SPF (M.D. Fla.); *Hobson v. Midland Credit Management, Inc.*, 4:23-cv-2759 (S.D. Tex.); *Roush v. Midland Credit Management, Inc.*, 2:23-cv-2509 (D. Kan.); *Joan Chin v. Midland Credit Management, Inc.*, 903834024 (Supreme Court of the State of New York – Albany County); *Schuhmann v. Midland Credit Management, Inc.*, 3:24-cv-00132 (N.D. Cal.); *Stewart v. Midland Credit Management, Inc.*, 24-cv-0069-W-JLB (S.D. Cal.); *Quick v. Midland Credit Management, Inc.*, 3:23-cv-00543-JLS-AHG (S.D. Cal.); *Beam v. Midland Credit Management, Inc.*, 4:23-cv-945, (N.D. Tex.), and *Sandra Kaiser v. Midland Credit Management, Inc.*, 2:25-cv-00702, (E.D. Pa.).

54. In fact, MCM has a pattern and practice of communicating with consumers after receiving notice of consumers' attorneys' representation.

55. In fact, MCM has a pattern and practice of communicating with consumers after receiving notice of consumers' attorneys' information.

56. MCM had actual notice of the Letter of Representation and Additional Letter of Representation.

57. The March Letter alleged that Plaintiff no longer owed money to Citibank, but now owed $2,223.59 to MCM.

58. However, Plaintiff was never involved in any transaction with MCM for $2,223.59 and never entered into any contract with MCM for the payment of $2,223.59. Plaintiff was never indebted to MCM, and was never indebted to MCM for $2,223.59. MCM never extended credit to Plaintiff for $2,223.59. MCM does not possess competent proof that Plaintiff owes $2,223.59 to MCM. MCM holds no legal right, title, or interest in $2,223.59 owed by Plaintiff.

59. Upon information and belief, MCM claims it purchased Plaintiff's account from Citibank and it is therefore entitled to payment from Plaintiff.

60. Upon information and belief, MCM's alleged purchase of Plaintiff's account was ostensibly made pursuant to a certain Master Account Sale Agreement, and a certain Account Sale Addendums. These agreements are referred to collectively herein as the "Master Account Sale Agreement."

61. However, upon information and belief, the Master Account Sale Agreement, does not memorialize a "true sale" of Plaintiff's account from Citibank to MCM.

62. Upon information and belief, the Master Account Sale Agreement, does not memorialize a "true sale" of Plaintiff's account from Citibank to MCM because, *inter alia*, Citibank retains control over the accounts.

63. Upon information and belief, the Master Account Sale Agreement, does not memorialize a "true sale" of Plaintiff's account from Citibank to MCM because, *inter alia*, Citibank retains audit rights over MCM.

64. Upon information and belief, the Master Account Sale Agreement, does not memorialize a "true sale" of Plaintiff's account from Citibank to MCM because, *inter alia*, Citibank retains the right to require MCM to provide regular reporting.

65. Upon information and belief, the Master Account Sale Agreement, does not memorialize a "true sale" of Plaintiff's account from Citibank to MCM because, *inter alia*, Citibank retains the right to recall and/or repurchase and/or exchange the accounts from MCM.

66. Upon information and belief, the Master Account Sale Agreement, does not memorialize a "true sale" of Plaintiff's account from Citibank to MCM because, *inter alia*, Citibank retains recourse from MCM concerning the accounts from MCM.

67. Upon information and belief, other than the Master Account Sale

Agreement, MCM claims no other right to payment from Plaintiff.

68. Despite the foregoing, in an attempt to collect the alleged debts, MCM began furnishing negative information to the credit reporting agencies regarding a Citibank account.

69. Equifax, Experian, and TransUnion (collectively, the "CRAs") are the three major consumer reporting agencies in the United States, and regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

70. The reports of CRAs generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

71. The CRAs obtain consumer information from various sources. Some

consumer information is sent directly to the credit reporting agencies by furnishers, and other information is independently gathered by credit reporting agencies from third party providers, vendors, or repositories, like computerized reporting services like PACER and Lexis-Nexis.

72. The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from credit reporting agencies to make lending decisions.

73. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the CRAs' consumer reports.

74. Accounts in collection is the biggest factor use in FICO Scores, and consumers with collections on their credit reports likely have lower credit scores than consumers who have no collections.

75. The information credit reporting agencies include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

76. FICO Scores are calculated using information contained in the consumer's report.

77. FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

78. FICO Scores factor in the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

79. "Payment history" refers to whether a consumer has paid his[er] or his[er] bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

80. The "amount of debt" a consumer owes has a major impact on their credit score. When a credit reporting agency reports a debt as outstanding when it is in fact discharged, the credit reporting agency indicates that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

81. Lenders also consider a consumer's debt-to-income ratio before deciding to extend credit or approve financing terms.

82. Banks, landlords, credit card issuers, employers, insurance companies,

utility providers, among others, all use credit scores to assess how likely a consumer is to make timely payments. A higher credit score leads to better loan terms and lower interest rates, while a lower credit score leads to worse loan terms, higher interest rates, and/or credit denials.

83. Debt-to-income compares the total amount a consumer owes to the total amount a consumer earns.

84. A consumer's income, however, is not included in their consumer report; only their amount of debt is.

85. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's debt-to-income will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest and lower credit limits).

86. The impact of debt and debt collection is not just financial. In fact, the Federal Reserve Bank of Atlanta published a study, which was the joint collaboration of economists Laura Argys, Andrew Friedson, and Federal Reserve economist M. Melinda Pitts, that directly linked financial strain from higher debt levels to higher death rates among American consumers.[2] The study also found, the impact of delinquency is most pronounced in the short-term as individuals are far more likely

---

[2] Laura M. Argys, Andrew Friedson, & M. Melinda Pitts, *Killer Debt: The Impact of Debt on Mortality*, FRB Atlanta Working Paper No. 2016-14 (2016).

to die as a result of an immediate debt shock than in response to lingering debt.[3] As part of the study, the economists analyzed credit balance and delinquency data maintained by the Federal Reserve.[4] The results, while not surprising, showed that individuals with bad credit and higher amounts of delinquent debt, had a higher probability of death than those with better credit and smaller amounts of delinquent debt.[5]

87. Plaintiff became aware of MCM's credit reporting.

88. MCM's credit reporting negatively impacted Plaintiff's credit score.

89. MCM's credit reporting negatively impacted Plaintiff's credit score worthiness.

90. At some point, Citibank began furnishing negative information to the CRAs regarding the Citibank account, but thereafter, ceased reporting negative information.

91. After Citibank began reporting negative information regarding the Citibank account, Plaintiff's credit score and credit worthiness was negatively impacted.

92. Then, MCM began reporting negative information regarding a Citibank account with an account number of 3076xxxxx, but Plaintiff never had an account

---

[3] *Id.* at 14.

[4] *Id.* at 3.

[5] *Id.* at 4.

with Citibank with an account number of 3076xxxxx.

93. In addition, MCM was reporting an open date of September 29, 2020; however, Plaintiff never opened an account with Citibank on September 29, 2020.

94. Any third-party viewing MCM's reporting would reasonably believe the account was opened with MCM on September 29, 2020.

95. The algorithm of the credit reporting agencies is coded in such a way that negative reporting impacts a consumer's score more than positive reporting.

96. The algorithm of the credit reporting agencies is coded in such a way that a consumer's credit score does not increase to the same degree as the consumer's credit score decreased when a negative account is deleted.

97. When MCM began reporting the Citibank account after Citibank ceased reporting, Plaintiff's credit score and creditworthiness was negatively impacted a second time, in part, because the algorithm of the credit reporting agencies understood MCM's reporting to be a new negative report.

98. MCM knows the foregoing, and uses credit reporting as part of its collection practices and as a way to coerce consumers into paying MCM for debts not owed to MCM, in order to increase profits for MCM.

99. MCM's subsequent credit reporting of the Citibank account after Citibank already ceased reporting is false, misleading, and/or deceptive.

100. MCM's subsequent credit reporting of the Citibank account, and credit

reporting of the Citibank account after Citibank already ceased reporting is unfair and/or unconscionable.

101. MCM's subsequent credit reporting of the Citibank account, and credit reporting of the Citibank account after Citibank already ceased reporting is conduct the natural consequence of which is to harass, abuse, and/or oppress.

102. As a result of MCM's reporting, Plaintiff lost access to credit, and incurred higher cost of credit.

103. MCM's credit reporting was viewed by third parties.

104. Plaintiff suffered harm related directly to MCM's conduct.

105. Plaintiff's credit score declined when MCM began reporting the Citibank account, causing Plaintiff's credit score to suffer a second decline when Plaintiff's credit score already suffered a decline when Citibank began furnishing negative information regarding the alleged debt.

106. Citibank is liable for the debt collectors it retains and transfers accounts to.

107. The acts of Defendants as described in this Complaint were performed by Defendants or on Defendants' behalf by their owners, officers, agents, and/or employees acting within the scope of their actual or apparent authority. As such, all references to Defendants in this Complaint shall mean Defendants or their owners, officers, agents, and/or employees.

108. Defendants' conduct as described in this Complaint was willful, with the purpose to either harm Plaintiff or with reckless disregard for the harm to Plaintiff that could result from Defendants' conduct.

109. Plaintiff justifiably fears that, absent this Court's intervention, Defendants will continue to use abusive, deceptive, unfair, and unlawful means in their attempts to collect the alleged debt and other alleged debts.

110. Plaintiff justifiably fears that, absent this Court's intervention, Defendants will ultimately cause Plaintiff further unwarranted economic harm.

111. Plaintiff justifiably fears that, absent this Court's intervention, Defendants will ultimately cause Plaintiff further unwarranted harm to Plaintiff's credit rating.

112. Plaintiff justifiably fears that, absent this Court's intervention, Defendants will ultimately cause Plaintiff to be sued.

113. Plaintiff has the right to live without being subject to false claims from Defendants. Plaintiff has the right to be free from invasions into Plaintiff's privacy and intrusions upon Plaintiff's solitude and seclusion. Plaintiff has the right to be free from harassing, annoying, oppressive, and abusive conduct. Defendants infringed upon Plaintiff's rights, causing Plaintiff concern, worry, loss of time, emotional distress, and economic harm.

114. As of result of Defendants' conduct, Plaintiff suffered damages because

Plaintiff has been subjected to a higher risk of death as a result of Defendants' inaccurate and/or misleading reporting.

115. As a result of Defendants' conduct, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from credit; having to pay higher interest rates, and mental and emotional pain, anguish, humiliation, and embarrassment.

116. As a result of Defendants' conduct, Plaintiff suffered injury-in-fact by being subjected to unfair, harassing, and abusive practices of Defendants.

117. As a result of Defendants' conduct, Plaintiff suffered injury-in-fact resulting from the invasion into Plaintiff's right to privacy.

118. As a result of Defendants' conduct, Plaintiff suffered injury-in-fact resulting from invasion into Plaintiff's right to seclusion.

119. As a result of Defendants' conduct, Plaintiff suffered an intrusion into Plaintiff's right to quiet enjoyment of life.

120. As a result of Defendants' conduct, Plaintiff suffered an intrusion into Plaintiff's attorney-client relationship.

121. As a result of Defendants' conduct, Plaintiff has suffered actual harm based on his emotional distress, mental anguish, fear of personal and financial safety and security, and attorney's fees.

122. As a result of Defendants' conduct, Plaintiff began to lose confidence in

his attorneys because Plaintiff continued to be contacted directly after retaining his attorneys.

123. As a result of Defendants' conduct, Plaintiff has suffered inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, fear of personal and financial safety and security, and attorney's fees.

124. A favorable decision herein would serve to deter Defendants from further similar conduct.

**FIRST COUNT**
**Violation of 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A), 1692e(10), and 1692f**

125. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

126. The Plaintiff is a "consumer" as that term defined by the FDCPA.

127. MCM is a "debt collector" as that term is defined by the FDCPA.

128. The money sought from Plaintiff is a "debt" as that term is defined by the FDCPA.

129. The March Letter is a "communication" as that term is defined by the FDCPA.

130. The actions described herein constitute "an attempt to collect a debt" or "were taken in connection with an attempt to collect a debt" within the meaning of the FDCPA.

131. 15 U.S.C. § 1692d provides, generally, that a debt collector may not engage in conduct the natural consequence of which is to harass, abuse, and/or oppress.

132. 15 U.S.C. § 1692e provides, generally, that a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

133. 15 U.S.C. § 1692e(2)(A) prohibits the false representation of the character, amount, or legal status of any debt.

134. 15 U.S.C. § 1692e(10) prohibits the use of any false representation or deceptive means to collect or attempt to collect any debt.

135. 15 U.S.C. § 1692f prohibits the use of unfair or unconscionable means to collect or attempt to collect any debt.

136. An allegation by a debt collector that a consumer owes a debt to a certain entity when the consumer does not owe a debt to that entity is a violation of 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A) and 1692e(10).

137. An allegation by a debt collector that a consumer owes a certain amount of money when the consumer does not that amount is a violation of 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A) and 1692e(10).

138. As previously stated in this Complaint, Plaintiff did not owe the amount MCM alleged is owed to MCM by Plaintiff for the Citibank account.

139. MCM's contention that Plaintiff owed the Citibank account to MCM, when Plaintiff did not owe the Citibank account to MCM, amounts to conduct the natural consequence of which is to harass, abuse, and/or oppress in connection with the collection of the alleged debt in violation of 15 U.S.C. § 1692d.

140. MCM's contention that Plaintiff owed the Citibank account to MCM, when Plaintiff did not owe the Citibank account to MCM, is a false, misleading, and/or deceptive representation, in violation of 15 U.S.C. § 1692e.

141. MCM's contention that Plaintiff owed the Citibank account to MCM, when Plaintiff did not owe the Citibank account to MCM, is a false representation of the character, amount, or legal status of the alleged debt, in violation of 15 U.S.C. § 1692e(2)(A).

142. MCM's contention that Plaintiff owed the Citibank account to MCM, when Plaintiff did not owe the Citibank account to MCM, is a false representation or deceptive means to collect or attempt to collect the alleged debt, in violation of 15 U.S.C. § 1692e(10).

143. MCM's contention that Plaintiff owed the Citibank account to MCM, when Plaintiff did not owe the Citibank account to MCM, is unfair or unconscionable means in an attempt to collect the alleged debt, in violation of 15 U.S.C. § 1692f.

144. For the foregoing reasons, MCM violated 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A), 1692e(10), and 1692f, and is liable to Plaintiff therefor.

## SECOND COUNT
## Violation of 15 U.S.C. §§ 1692c(a)(2) and 1692c(c)

145. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

146. The Plaintiff is a "consumer" as that term defined by the FDCPA.

147. MCM is a "debt collector" as that term is defined by the FDCPA.

148. The money sought from Plaintiff is a "debt" as that term is defined by the FDCPA.

149. The March Letter is a "communication" as that term is defined by the FDCPA.

150. The actions described herein constitute "an attempt to collect a debt" or "were taken in connection with an attempt to collect a debt" within the meaning of the FDCPA.

151. 15 U.S.C. § 1692c(a)(2), titled "Communication with the Consumer Generally," prohibits a debt collector from communicating with a consumer in connection with the collection of any debt "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the

consumer."

152. As described herein, MCM violated 15 U.S.C. § 1692c(a)(2).

153. A violation of 15 U.S.C. § 1692c(a)(2) has a close relationship to an invasion of privacy.

154. A violation of Section 15 U.S.C. § 1692c(a)(2) is an invasion of privacy.

155. MCM invaded Plaintiff's privacy with respect to the Citibank account and Citibank account.

156. 15 U.S.C. § 1692c(c), titled "Ceasing Communication," prohibits a debt collector, subject to certain exceptions not relevant here, from communicating with a consumer in connection with the collection of any debt "[i]f a consumer notifies a debt collector in writing . . . that the consumer wishes the debt collector to cease further communication with the consumer."

157. 15 U.S.C. § 1692c(c) further states, "[i]f such notice from the consumer is made by mail, notification shall be complete upon receipt."

158. As described herein, MCM violated 15 U.S.C. § 1692c(c).

159. A violation of 15 U.S.C. § 1692c(c) has a close relationship to an intrusion upon the rights to solitude and seclusion.

160. A violation of 15 U.S.C. § 1692c(c) is an intrusion upon the rights to solitude and seclusion.

161. MCM intruded upon Plaintiff's rights to solitude and seclusion.

162. A violation of 15 U.S.C. § 1692c(c) also has a close relationship to interference with the attorney-client relationship.

163. A violation of Section 1692c(c) is an interference with the attorney-client relationship.

164. MCM interfered with Plaintiff's and his attorney's attorney-client relationship with respect to the Citibank account and Citibank account.

165. For the foregoing reasons, MCM violated 15 U.S.C. §§ 1692c(a)(2) and 1692c(c), and is liable to Plaintiff therefor.

**THIRD COUNT**
**Violation of 15 U.S.C. §§ 1692e, 1692e(8), 1692e(10), and 1692f**

166. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

167. The Plaintiff is a "consumer" as that term defined by the FDCPA.

168. MCM is a "debt collector" as that term is defined by the FDCPA.

169. The money sought from Plaintiff is a "debt" as that term is defined by the FDCPA.

170. The March Letter is a "communication" as that term is defined by the FDCPA.

171. Each report to the credit reporting agencies is a "communication" as that term is defined by the FDCPA.

172. The actions described herein constitute "an attempt to collect a debt" or

"were taken in connection with an attempt to collect a debt" within the meaning of the FDCPA.

173. 15 U.S.C. § 1692e provides, generally, that a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

174. 15 U.S.C. § 1692e(8) prohibits a debt collector from communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

175. 15 U.S.C. § 1692e(10) prohibits the use of any false representation or deceptive means to collect or attempt to collect any debt.

176. 15 U.S.C. § 1692f prohibits using unfair or unconscionable means to collect or attempt to collect any debt.

177. MCM violated the FDCPA by reporting information regarding the Citibank account when Plaintiff did not owe MCM any money.

178. MCM knew or should have known the credit reporting was false.

179. MCM misrepresented the character, amount, and legal status of the alleged debt when it reported the Citibank account to the credit reporting agencies.

180. MCM violated the FDCPA by using unfair and/or unconscionable means by reporting the Citibank account to the credit reporting agencies after

Citibank had ceased reporting the account, causing Plaintiff's credit score to be negatively impacted.

181. MCM violated the FDCPA by using false representation or deceptive means when it reported information to the CRAs that Plaintiff owed money for a Citibank account, with an account number of 3076xxxxx.

182. MCM violated the FDCPA by using false representation or deceptive means when it reported to the CRAs that Plaintiff owed money for Citibank account, with an open date of  September 29, 2020.

183. MCM violated the FDCPA by engaging in conduct the natural consequence of which is to harass, abuse, and/or oppress by causing duplicate reporting of the Citibank account the credit reporting agencies after Citibank had ceased reporting the Citibank account, causing Plaintiff's credit score and creditworthiness to be negatively impacted for a second time for the same account.

184. MCM violated the FDCPA by engaging in conduct the natural consequence of which is to harass, abuse, and/or oppress by reporting information regarding the Citibank account, when Plaintiff did not owe MCM any money.

185. MCM violated the FDCPA by using unfair and/or unconscionable means by reporting the Citibank account to the credit reporting agencies after Citibank had ceased reporting the Citibank account, causing Plaintiff's credit score and creditworthiness to be negatively impacted for a second time for the same

account.

186. MCM violated the FDCPA by using unfair and/or unconscionable means by reporting information regarding the Citibank account, when Plaintiff did not owe MCM any money.

187. For the foregoing reasons, MCM violated 15 U.S.C. §§ 1692e, 1692e(8), 1692e(10), and 1692f and is liable to Plaintiff therefor.

**FOURTH COUNT**
**Violation of Cal. Civ. Code § 1788.13(k)**

188. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

189. Cal. Civ. Code § 1788.13(k) prohibits debt collectors from the false representation that the consumer debt has been, is about to be, or will be sold, assigned, or referred to a debt collector for collection.

190. The March Letter stated, or otherwise implied, the alleged debt was sold to MCM.

191. As stated more fully in this Complaint, the transfer to MCM was not a true sale.

192. MCM does not investigate whether the transaction between the original creditor and MCM was in fact a true sale.

193. MCM's intentional or negligent conduct of falsely representing that MCM is the current creditor of the debt, caused Plaintiff confusion, anxiety, worry,

and emotional distress, causing Plaintiff to spend time to retain counsel, causing her loss of time, in violation of Cal. Civ. Code § 1788.13(k).

194. MCM's false representation that the debt has been, is about to be, or will be sold, assigned, or referred to a debt collector for collection, violates Cal. Civ. Code § 1788.13(k).

195. For the foregoing reasons, MCM violated Cal. Civ. Code § 1788.13(k) and is liable to Plaintiff therefor.

**FIFTH COUNT**
**Violation of Cal. Civ. Code § 1788.14(c)**

196. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

197. Cal. Civ. Code § 1788.14(c) prohibits debt collectors from initiating communications with a consumer when the debt collector has been previously notified in writing by the consumer's attorney that the consumer is represented by the attorney with respect to the debt and the notice includes the attorney's name and address and a request by the attorney that all communications regarding the debt be addressed to the attorney.

198. MCM knew Plaintiff was represented by counsel when MCM sent the March Letter directly to Plaintiff in an attempt to collect the alleged debt.

199. MCM's communication with Plaintiff directly, when MCM knew Plaintiff was represented by counsel, violates Cal. Civ. Code § 1788.14(c).

200. MCM invaded Plaintiff's privacy.

201. A violation of Cal. Civ. Code § 1788.14(c) is an interference with the attorney-client relationship.

202. MCM interfered with Plaintiff's and his attorney's attorney-client relationship.

203. For the foregoing reasons, MCM violated Cal. Civ. Code § 1788.14(c), and is liable to Plaintiff therefor.

## SIXTH COUNT
## Violation of Cal. Civ. Code § 1788.17

204. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

205. The Plaintiff is a "consumer" as that term defined by the FDCPA.

206. MCM is a "debt collector" as that term is defined by the FDCPA.

207. The money sought from Plaintiff is a "debt" as that term is defined by the FDCPA.

208. The March Letter each are a "communication" as that term is defined by the FDCPA.

209. The actions described herein constitute "an attempt to collect a debt" or "were taken in connection with an attempt to collect a debt" within the meaning of the FDCPA.

210. 15 U.S.C. § 1692c(a)(2), titled "Communication with the Consumer Generally," prohibits a debt collector from communicating with a consumer in connection with the collection of any debt "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer."

211. As described herein, MCM violated 15 U.S.C. § 1692c(a)(2).

212. A violation of 15 U.S.C. § 1692c(a)(2) has a close relationship to an invasion of privacy.

213. A violation of Section 15 U.S.C. § 1692c(a)(2) is an invasion of privacy.

214. MCM invaded Plaintiff's privacy.

215. 15 U.S.C. § 1692c(c), titled "Ceasing Communication," prohibits a debt collector, subject to certain exceptions not relevant here, from communicating with a consumer in connection with the collection of any debt "[i]f a consumer notifies a debt collector in writing . . . that the consumer wishes the debt collector to cease further communication with the consumer."

216. 15 U.S.C. § 1692c(c) further states, "[i]f such notice from the consumer is made by mail, notification shall be complete upon receipt."

217. As described herein, MCM violated 15 U.S.C. § 1692c(c).

218. A violation of 15 U.S.C. § 1692c(c) has a close relationship to an intrusion upon the rights to solitude and seclusion.

219. A violation of 15 U.S.C. § 1692c(c) is an intrusion upon the rights to solitude and seclusion.

220. MCM intruded upon Plaintiff's rights to solitude and seclusion.

221. A violation of 15 U.S.C. § 1692c(c) also has a close relationship to interference with the attorney-client relationship.

222. A violation of Section 1692c(c) is an interference with the attorney-client relationship.

223. MCM interfered with Plaintiff's and his attorney's attorney-client relationship.

224. Cal. Civ. Code § 1788.17 provides that a violation of the FDCPA is also a violation of the RFDCPA.

225. MCM's conduct described herein violates the FDCPA, thus violating Cal. Civ. Code § 1788.17, making MCM liable to Plaintiff therefor.

**SEVENTH COUNT**
**Violation of Cal. Civ. Code § 1788.14(c)**

226. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

227. Cal. Civ. Code § 1788.14(c) prohibits debt collectors from initiating communications with a consumer when the debt collector has been previously notified in writing by the consumer's attorney that the consumer is represented by the attorney with respect to the debt and the notice includes the attorney's name and address and a request by the attorney that all communications regarding the debt be addressed to the attorney.

228. Citibank knew Plaintiff was represented by counsel when MCM sent the March Letter directly to Plaintiff in an attempt to collect the alleged debt.

229. MCM's communication with Plaintiff directly, on behalf of Defendants, when Defendants knew Plaintiff was represented by counsel, violates Cal. Civ. Code § 1788.14(c).

230. Defendants invaded Plaintiff's privacy.

231. A violation of Cal. Civ. Code § 1788.14(c) is an interference with the attorney-client relationship.

232. Defendants interfered with Plaintiff's and his attorney's attorney-client relationship.

233. For the foregoing reasons, Citibank violated Cal. Civ. Code § 1788.14(c), and is liable to Plaintiff therefor.

///

///

**EIGHTH COUNT**
**Violation of Cal. Civ. Code § 1788.17**

234. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

235. The Plaintiff is a "consumer" as that term defined by the FDCPA.

236. MCM is a "debt collector" as that term is defined by the FDCPA.

237. The money sought from Plaintiff is a "debt" as that term is defined by the FDCPA.

238. The March Letter each are a "communication" as that term is defined by the FDCPA.

239. The actions described herein constitute "an attempt to collect a debt" or "were taken in connection with an attempt to collect a debt" within the meaning of the FDCPA.

240. 15 U.S.C. § 1692c(a)(2), titled "Communication with the Consumer Generally," prohibits a debt collector from communicating with a consumer in connection with the collection of any debt "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the

consumer."

241. As described herein, Defendants violated 15 U.S.C. § 1692c(a)(2).

242. A violation of 15 U.S.C. § 1692c(a)(2) has a close relationship to an invasion of privacy.

243. A violation of Section 15 U.S.C. § 1692c(a)(2) is an invasion of privacy.

244. Defendants invaded Plaintiff's privacy.

245. 15 U.S.C. § 1692c(c), titled "Ceasing Communication," prohibits a debt collector, subject to certain exceptions not relevant here, from communicating with a consumer in connection with the collection of any debt "[i]f a consumer notifies a debt collector in writing . . . that the consumer wishes the debt collector to cease further communication with the consumer."

246. 15 U.S.C. § 1692c(c) further states, "[i]f such notice from the consumer is made by mail, notification shall be complete upon receipt."

247. As described herein, Defendants violated 15 U.S.C. § 1692c(c).

248. A violation of 15 U.S.C. § 1692c(c) has a close relationship to an intrusion upon the rights to solitude and seclusion.

249. A violation of 15 U.S.C. § 1692c(c) is an intrusion upon the rights to solitude and seclusion.

250. Defendants intruded upon Plaintiff's rights to solitude and seclusion.

251. A violation of 15 U.S.C. § 1692c(c) also has a close relationship to

interference with the attorney-client relationship.

252. A violation of Section 1692c(c) is an interference with the attorney-client relationship.

253. Defendants interfered with Plaintiff's and his attorney's attorney-client relationship.

254. Cal. Civ. Code § 1788.17 provides that a violation of the FDCPA is also a violation of the RFDCPA.

255. Citibank's conduct described herein violates the FDCPA, thus violating Cal. Civ. Code § 1788.17, making Citibank liable to Plaintiff therefor.

## JURY DEMAND

256. Plaintiff hereby demands a trial of this action by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment be entered as follows:

a. Finding MCM's actions violate the FDCPA; and
b. Awarding damages to Plaintiff pursuant to 15 U.S.C. § 1692kt; and
c. Awarding Plaintiff's attorneys' fees pursuant to 15 U.S.C. § 1692k, calculated on a "lodestar" basis; and
d. Finding MCM's actions violate the RFDCPA; and
e. Awarding damages to Plaintiff pursuant to Cal. Civ. Code § 1788.30(b); and
f. Awarding Plaintiff's attorneys' fees pursuant to Cal. Civ. Code § 1788.30(c); and
g. Finding Citibank's actions violate the RFDCPA; and

h. Awarding damages to Plaintiff pursuant to Cal. Civ. Code § 1788.30(b); and

i. Awarding Plaintiff's attorneys' fees pursuant to Cal. Civ. Code § 1788.30(c); and

j. Awarding Plaintiff punitive damages to be determined at trial, for the sake of example and punishing Defendants for their malicious conduct, pursuant to Cal. Civ. Code § 3294; and

k. Awarding the costs of this action to Plaintiff; and

l. Awarding pre-judgment interest and post-judgment interest to Plaintiff; all together with

m. Such other and further relief that the Court determines is just and proper.

DATED: May 17, 2026

Respectfully submitted,

*/s/: Ely Grinvald, Esq.*
Ely Grinvald, Esq. (SBN 285475)
2355 Westwood Blvd., #562
Los Angeles, CA 90064
Phone: (310) 405-5684
grinvaldely@gmail.com

*Attorney for Plaintiff*
*Darryl Taylor*